The Foundation for Divine Meditation, Incorporated v. Commissioner. Merle E. Parker v. Commissioner.
Foundation for Devine Meditation, Inc. v. Commissioner
Docket Nos. 2601-62, 2600-62.
United States Tax Court
T.C. Memo 1965-77; 1965 Tax Ct. Memo LEXIS 248; 24 T.C.M. (CCH) 411; T.C.M. (RIA) 65077; April 5, 1965
*248 FDM not entitled to exemption under sec. 501(c)(3) because it was not organized and operated exclusively for religious purposes. Its publication and distribution of various materials constituted a substantial nonexempt activity. Parker realized taxable income from certain items, including litigation expenses paid by FDM on his behalf. Both FDM and Parker are liable for additions to tax under sec. 6651(a), I.R.C. 1954, for failure to file returns, and FDM is liable for additions to tax for underpayment of taxes under sec. 6653(a), I.R.C. 1954. Merle E. Parker, Cedar Heart of the Ozarks, Thornfield, Mo., (an officer) for the petitioners. Douglas W. Argue for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income taxes and additions to tax as follows: Section
Section
Year
Deficiency
6651(a) [1]
6653(a)
The Foundation for Divine Meditation,
Incorporated, Docket No. 2601-62
1954
$70,092.60
$17,523.15
$3,504.63
1955
23,388.64
5,847.16
1,169.43
1956
14,128.14
3,532.04
706.41
1957
4,873.82
1,218.45
243.69
1958
9,579.38
2,394.85
478.97
1959
18,273.92
4,568.48
913.70
Merle E. Parker, Docket No. 2600-62
1955
30,686.30
1956
17,155.18
4,288.80
1957
4,563.64
1,140.91
1958
11,607.26
1959
23,513.73
*249 Some concessions have been made by respondent so that decisions will be entered under Rule 50 if any issues are decided adversely to the petitioners. The issues for decision are: (1) Whether, during the years in issue, the petitioner The Foundation for Divine Meditation, Incorporated (hereinafter sometimes referred to as FDM), was exempt from taxation under section 501(c)(3) as a religious or educational organization; (2) If issue one is answered in the affirmative, whether any of FDM's income is subject to the unrelated business income tax imposed by section 511; (3) Whether the petitioner Merle E. Parker (hereinafter sometimes referred to as Parker) realized taxable income from various payments made by FDM; (4) Whether FDM is liable for additions to tax imposed by sections 6651(a) and 6653(a) for failure to file returns in, and underpayment of income taxes for, 1954 through 1959; and (5) Whether Parker is liable for additions to tax imposed by section 6651(a) for failure to file returns in 1956 and 1957. Findings of Fact Some of the facts have been stipulated and the stipulation of facts *250 and exhibits appended thereto are incorporated herein by this reference. Petitioner, Parker, an individual, presently resides in Thornfield, Missouri. During the years in issue he resided at Valley Center, California, and filed Federal income tax returns with the district director of internal revenue at Los Angeles, California, for calendar years 1955, 1958, and 1959. In July 1945, Parker purchased a tract of property in Riverside, California, and established a retail nursery business which failed in 1947. In August 1947, Parker enrolled in Riverside College, Riverside, California, which he attended for one year. Between 1948 and 1953 he received training, primarily by correspondence courses, from the College of Universal Truth in Chicago, Illinois. After completion of these courses in 1953, this school awarded him doctorates in metaphysical psychology and in divinity. During the latter part of 1948, Parker and several other persons interested in metaphysical and occult doctrines held discussions for the purpose of forming an organization which later came to be known as "The International Fraternal Order of the Foundation for Divine Meditation." At trial Parker insisted that these *251 persons remain anonymous. Petitioner FDM is a nonprofit corporation organized in February 1955 under the laws of the State of California, located in Valley Center, California. It is a continuation of an unincorporated association organized by Parker in October 1949. On or about October 24, 1949, Parker caused to be filed with the office of the secretary of state of California a registration of the fraternal name "The Foundation for Divine Meditation." During the years 1954 through 1959 FDM did not file any Federal income tax returns. The purposes for which FDM was organized are stated in the preamble to the bylaws dated October 24, 1949, as follows: THEREFORE, hereby propose to establish, and as a result of such proposal, do hereby establish a Sacred Fraternal Order for the purpose of teaching, practicing, and applying the True Sacred Teachings and Commands of Jesus Christ, together with any and all other Sacred Teachings of Ancient Origin which may assist in the understanding of the Eternal Laws of Almighty God, and the name of this Sacred Fraternal Order hereby established is the INTERNATIONAL FRATERNAL ORDER OF THE FOUNDATION FOR DIVINE MEDITATION, which official abbreviation of *252 such name is I.F.O.F.F.D.M. For the purpose of public identification, this Sacred Fraternal Order shall be known simply as THE FOUNDATION FOR DIVINE MEDITATION, and we hereby authorize, but do not require that this Sacred Fraternal Order be incorporated at some future date, and do empower the presiding officer and secretary of this Order to incorporate same, at such time as they shall deem it wise and expedient to do so. The bylaws, rules and discipline provided for the offices of supreme grand counselor and national director, supreme grand secretary and national secretary, and supreme grand treasurer and national treasurer, which positions were to be held by Parker, Mary Lewis Anderson of Roanoke, Virginia, and Iyonne Edgar of Phoenix, Arizona, respectively. Other provisions of the bylaws provided for the establishment of schools, academies, churches, or branches throughout the United States, or in any country of the world, and the establishment of local study groups, councils and grand councils. The bylaws also provided for the creation of subordinate offices to be held by group leaders, counselors, and grand counselors, the duties of each being described therein. As of the time *253 of trial, none of the subordinate divisions, schools, academies, churches, or branches thereof had been established. Neither was there any indication of the appointment of any of the subordinate officers authorized under the bylaws. The final article of the bylaws contained miscellaneous provisions and provided, in part, as follows: The income of this Order shall be from donations, tuition fees, and gifts from Members and others who choose to assist its work, goals, and growth. In August 1950, a four-page document drafted by Parker, entitled "CONSTITUTION," was filed with the County Recorder, Riverside County, California. Article II of this document provided that: The primary purpose of THE FOUNDATION FOR DIVINE MEDITATION shall be to teach the application of certain spiritual, psychological, physical, and metaphysical principles to the problems of daily life. In furtherance of its goal it shall, from time to time, publish books, booklets, courses, and reports for the benefit of its Membership. Article VIII, part 6, provided that: The Members of this organization shall be of two classes with voting privileges as follows: a - The Directorate, which shall include the Board of Directors *254 and all Members who have completed prescribed studies necessary to receive appointments to the office of Counselor, or an office superior to that rank. Each member of the Directorate shall have one vote in matters pertaining to the organization. b - General Membership, which shall include all degrees of the organization below that of Counselor. Members in this class shall not have the privilege of voting in matters pertaining to the organization. Article VIII, part 9, provided that: No provision of these Articles shall be construed as prohibiting any officer of this Organization from offering for sale to the public under his own name, or under the name of any organization or publishing firm other than THE FOUNDATION FOR DIVINE MEDITATION, any writing of any nature of which he is the author or copyright owner, except that the specific writings of Merle E. Parker comprising the basic study course of this Fraternal Order, and entitled "Power of the Ages", "Blueprint of Life", and "The Living Clay" respectively, shall not be sold to any person whomsoever without unanimous consent of all members of the Board of Directors of this Organization. Article VIII, part 10, provided that: The primary *255 source of income of THE FOUNDATION FOR DIVINE MEDITATION shall be from gifts, contributions, and bequests from members or others who wish to assist its aims and goals. The articles of incorporation of FDM were filed with the secretary of state of California in February 1955. Article Two (b) authorized execution of contracts, ownership of property and carrying on business activities, in broad terms. An amendment filed on March 5, 1956, provided that the property of FDM was irrevocably dedicated to religious and charitable purposes. Parker, Mary Lewis Anderson and Iyonne Edgar were named as directors and officers. Since 1949, directors' meetings have been held on an average of less than once a year. These meetings were all held at the residence of the national secretary in Roanoke, Virginia. The meetings were attended only by Parker and the national secretary who in each instance acted as a quorum. The national treasurer was never in attendance. At the time of trial Parker had "lost track" of her. Parker has held the position of national director of FDM since its formation in 1949. The bylaws and constitution permit him to hold this position until death or voluntary resignation. As national *256 director, Parker had complete control over the day-to-day operations of FDM. He made all decisions on the manner of soliciting funds and the expenditures of money. He approved both the national secretary and the national treasurer, who were selected from those enrolled in study courses prior to the formal organization of FDM in October 1949. On income tax returns filed beginning in 1949, Parker variously described his occupation as "Student-Writer" (1949 return), "Psychological Counselor and Writer" (1951 return), "Author-Publisher" (1952 return), "Minister-Counselor" (1953, 1954, and 1955 returns), and "Director, Religious Corporation" (1958 return). Since 1949 the principal activity engaged in by Parker and FDM has been the publication and distribution of courses, booklets, monographs, reports, pamphlets, and newspapers written, compiled, or edited by Parker. Every year funds were solicited and publications mailed by Parker from Valley Center under the names of "FDM," "The National Institute of Christian Healing," "The Aquarius School of Masters," "The Academy of Self Attainment," "S.P.I. Foundation," "The Psycho-Metaphysical Research Society," and "The *257 Santa Ysabel Ming Tree Society," as well as under Parker's name as an individual. Parker considered that all of these mailings and solicitations were done on behalf of FDM, and consequently FDM is sometimes hereinafter referred to in lieu of the name of the affiliated organization. FDM's principal source of income was from amounts received in response to circulars and announcements. Some of the solicitation materials were mailed only to those persons who were regarded as "members" of FDM. Many of the materials were mailed to all persons listed on mailing lists rented or purchased by FDM. No record was kept of the amount received in any year from the distribution of specific publications. The "membership" of FDM consisted of those persons who signed and returned the solicitation forms used in announcing publications and obtaining funds for the FDM operations. FDM kept no formal membership roll. The only place where names of members were kept was on metal addressograph plates used in addressing correspondence. By using mailing lists to obtain membership, FDM had 30,000 members by 1953 and 60,000 by the end of 1954. The largest membership during the years at issue was attained in 1955 *258 when FDM had 65,000 members. The membership was scattered throughout the United States and in foreign countries. On May 3, 1954, FDM filed an exemption application claiming exemption from Federal income tax under section 101(6) of the Internal Revenue Code of 1939. By letter dated November 16, 1955, FDM was advised by the Internal Revenue Service that its application was denied. This ruling was reaffirmed in a letter dated June 30, 1958. From 1948 through the time of trial, Parker, FDM, and its affiliated organizations distributed various booklets, pamphlets and monographs. Some of these materials constituted courses of instruction in the doctrines of FDM. Most, if not all, of the materials were written by Parker, some when he was a student at Riverside College in 1948. Many are copyrighted under his name. Some of the principal courses are entitled "Power of the Ages," "Blueprint of Life," "Suggestive Passivity Induction," "The Sacred Laws Behind Miracles," "Dynamic Speed Hypnosis," "Cosmic Dynamics," "Sacred Magic of the Ancients," "Miracle Methods of the Masters," and "Sacred Wisdom of the Ancients." The subject matter of these courses relates generally to metaphysics, occult philosophy, *259 faith healing, physical and psychological development, and dietary practices. In connection with the above materials, Parker and FDM sent out various "announcements" to persons who were on mailing lists (including one list containing the names of approximately 750,000 members of a group, Psychiana, whose founder had died. These announcements contained coupons usually denominated "donation forms" which were to be used in order to receive materials. Though the announcements generally represented that the lessons were not for sale, great emphasis was placed on the need for "donations." [2] In connection with a series of monographs entitled "Forbidden Secrets of the Masters" offered by the Aquarius School of the Masters, distribution policy was stated as follows: All writings offered by this School are sent freely to those who assist the School's work with reasonably generous donations, as an indication of their sincere desire to spread the Ancient Wisdom. None are "FOR SALE". Whenever a MINIMUM DONATION is specified in the Bulletins, that amount or MORE must accompany any request for Study Material. We do not make any exceptions under any circumstances, and we do NOT send any Courses "C.O.D." *260 In 1951, under the name "Santa Ysabel Ming Tree Society," Parker mailed out a four-page brochure dealing with growing ming trees for profit. Under a bold face query that "There is One Thousand Dollars Worth of Space in your Window Sill Just Going to Waste: What are You Going to Do About It?" a letter began as follows: Dear Friend: That empty space in your window sill will grow ONE THOUSAND DOLLARS WORTH of the fabulous little Ming Trees which have all America agape with awe and wonder! We are sending you enough REAL TREE SEEDS to produce a thousand dollars worth of these Ming Trees at current prices, *261 and we're asking you to PLANT THEM AT ONCE! On the following pages you will find facts that will show you how to get great enjoyment - AND PROFIT - from your "partnership with Nature"! Yes, you will learn how to win the admiration of your friends - and how to beautify your home with a living creation of Nature - HOW TO MAKE REAL MONEY! An application form at the end of the brochure outlined the materials which would be sent and specified an initiation fee of $3, plus monthly dues of $2. The application stated that an applicant could save $7 by remitting $18 for a full year's membership dues in advance. In 1952, Parker wrote a lesson entitled "S.P.I. and Cosmic Communication," which was mailed in 1952 and 1953. The announcement for this lesson was headed: "From the Private Office of Dr. Merle E. Parker, Santa Ysabel, California." The following letter constituted the first page of the four-page announcement: I am sending you a SPECIAL LESSON "S.P.I. and Cosmic Communication," and I am sure you will gain much from studying it carefully. This lesson is YOURS TO KEEP, without cost or obligation, whether you are enrolled as one of my thousands of students or not! I want you to profit by *262 the information it contains, so that your own life and the lives of those you love can be made fuller and richer. Perhaps you are one of the people who received a folder recently describing S.P.I. (Suggestive Passivity Induction), and giving a number of its "materialistic" uses. This folder announced the need for teachers and practitioners of this amazing method of stopping pain, as well as many undesirable conditions by a MERE VERBAL COMMAND. A great many who received this folder wrote to me asking if they could enroll in the complete ten-week course in S.P.I. even though they wanted the information only for their own use, or for use within their own family, and not to become a teacher. THE ANSWER IS YES! Others wanted to know if S.P.I. was purely "materialistic" as suggested by the contents of this folder, which dealt primarily with its use to stop PAIN. THE ANSWER IS NO! The enclosed SPECIAL LESSON elaborates upon these two questions, and gives some additional information which you can use in your daily life RIGHT NOW. It provides information which can give you a more complete understanding of what S. P.I. is and what it can do for YOU and your loved ones. Study this lesson carefully. *263 If you already are enrolled in the complete ten-week course in SUGGESTIVE PASSIVITY INDUCTION, this SPECIAL LESSON will answer some of the questions which may have come to your mind concerning the ADVANCED APPLICATION of the amazing Techniques you already have learned. If you have NOT enrolled, write at once for the HANDBOOK AND PRACTICE GUIDE which describes SUGGESTIVE PASSIVITY INDUCTION, (S.P.I.), and contains a Sample Lesson and Special Technique which you can use to prove to yourself and to your friends how truly powerful the SPOKEN WORD can be! This HANDBOOK also tells you how you can obtain the COMPLETE TENWEEK COURSE IN SUGGESTIVE PASSIVITY INDUCTION without cost to yourself! Two methods of "earning while you are learning" are given! REMEMBER: You risk NOTHING when you send for the Handbook and Practical Guide, because your original deposit of only ONE DOLLAR will be refunded to you if you decide to return it in its original condition within five days after you receive it! You have EVERYTHING to gain and NOTHING to lose, so ACT AT ONCE! Yours, with best wishes for TRUE UNFOLDMENT. In the body of the announcement the prospective purchaser was advised "HERE IS YOUR OPPORTUNITY *264 TO EARN UP TO $10.00 AN HOUR!" The last page of the announcement contained the following statements: You risk NOTHING when you send for the "HANDBOOK AND PRACTICE GUIDE," which describes Suggestive Passivity Induction and gives a SPECIAL TECHNIQUE which you can use the very day you get the "Handbook" to demonstrate to your friends and yourself how TRULY POWERFUL the "Spoken Word" can be, when properly used and understood, BECAUSE I MAKE THIS POSITIVE MONEY-BACK GUARANTEE TO YOU: After you have used the ASTOUNDING TECHNIQUE given in your "Handbook" and have followed the detailed directions, IF YOU DO NOT GET RESULTS AS DESCRIBED THEREIN, RETURN THE "HANDBOOK" WITHIN FIVE DAYS AFTER YOU RECEIVE IT AND I WILL SEND YOUR DOLLAR BACK TO YOU! And furthermore… I WILL PAY ONE HUNDRED DOLLARS REWARD TO ANYONE WHO proves that the Technique described in your "Handbook" is not the very same Technique which I have used over and over again to GET RESULTS! Yes, this is the very same Technique which I have used to GET RESULTS before large audiences like the one before which I demonstrated this Technique in Riverside, California, when EVERYONE who followed the simple directions I gave them GOT RESULTS! *265 Yes, EVERYONE in that audience got results within a very few minutes, and YOU can too! Not only can YOU get results with this ASTOUNDING AND SIMPLE TECHNIQUE, but you also can TEACH others how to get results and get paid well for doing it, if you desire to! WARNING: Due to the TERRIFIC POWER in Suggestive Passivity Induction (SPI), I will not knowingly send this "Handbook" to any person who intends to try to use S.P.I. for any UNETHICAL OR WRONG PURPOSE! S.P.I. is a wonderful POWER when used for GOOD! I have never seen anything that equals its POWER! YET, I have searched for many years! BUT: You must ALWAYS put it to use for a GOOD PURPOSE ONLY! If you want to learn more about this ASTOUNDING POWER and what it may do for YOU, send ONLY ONE DOLLAR (which is refundable according to my MONEY-BACK GUARANTEE) RIGHT NOW! Yes, send your dollar AT ONCE because the "Handbooks" are going fast, and you do not want to be TOO LATE! I cannot promise to hold this offer open more than 30 days. YOU RISK NOTHING! you have my positive money-back guarantee to protect you! act now!/ In the summer of 1954, Parker conducted a campaign called "The Tobacco Crusade." Part of the materials used in this campaign *266 were written by Parker in 1949. The announcement for the campaign provided an order form for books entitled "The Cigarette and You" and "The Cigarette as a Physician Sees It," and a folder "Death Wrapped in Cellophane," which quoted prices for quantities up to 1,000 copies. The campaign was also advertised over two Mexican radio stations for approximately three months at a cost of approximately $4,500. In 1958, a circular "From the Desk of Dr. Merle E. Parker" was mailed announcing the availability of a confidential report concerning a "startling Experiment with the White Rat." The text of the announcement stated that the report was based on "A SECRET RESEARCH PROJECT… CAREFULLY GUARDED FOR 11 YEARS," and contained a coupon which stated: VERY IMPORTANT: This Confidential Report is NOT for sale! It will be sent as a GIFT to every person who responds to this "S.O.S." with a reasonably generous donation to help in the FIGHT FOR FREEDOM now under way! To: Dr. Merle Parker, P.O. Box 7, Santa Ysabel, California. YES! I do believe in the CONSTITUTION OF THE UNITED STATES OF AMERICA, and in the FREEDOMS WHICH IT GUARANTEES! I am enclosing a DONATION to help you carry on the CRUSADE FOR FREEDOM. *267 A copy of your CONFIDENTIAL REPORT on your startling Experiment with the White Rat will be appreciated. I am enclosing: ( ) $20.00; ( ) $15.00; ( ) $10.00; ( ) $5.00 or ( ) $ … Another announcement mailed under Parker's name during 1959 was a circular for two documents written by Parker entitled "Sacred Magic of the Psalms" and "Was Roosevelt Killed by the Ancient Death Prayer?" Both documents were advertised as being not for sale. However, it was explained in the circular that these documents could be obtained if one sent "a reasonably generous donation ($5.00 or more) for the 1959 Research and Expansion Program." During 1955, FDM conducted a campaign known as the "Christian Healing Crusade." In conjuction with the campaign, announcements were sent out which included the following application form by which a contributor could obtain a copy of "INSTANT HEALING NOW": Dear Friends of the CHRISTIAN HEALING CRUSADE: Yes! I want to take part in the daily SACRED HOUR HEALING SERVICES! I will join you in the Healing Service Number…. I live in the. .. TIME ZONE. (NOTE: If you are not sure which TIME ZONE you are in, ask your Postmaster; he can tell you.) ** I am enclosing a LOVE OFFERING *268 of $ … to help the CHRISTIAN HEALING CRUSADE. (IMPORTANT: All donations are deductible from your income tax… make your check or Money Order payable to THE FOUNDATION FOR DIVINE MEDITATION, INCORPORATED) * * *
I DESIRE SPECIAL PRAYER FOR: ( ) Healing for myself ( ) Healing for a friend or loved one whose name is ( ) Help to overcome an undesirable habit in myself. ( ) Help to overcome an undesirable habit of a loved one whose name is: ( ) Other help (Please describe briefly) Do you have a copy of "INSTANT HEALING NOW"?… (If you do NOT, you may obtain a copy by sending a donation of $2.00 or more; or you may obtain EXTRA COPIES at the following rates: 6 Copies for $6.00; 12 copies for $10.00; 100 copies for $55.00. Extra copies of this SPECIAL HEALING LESSON are available at $1.50 a dozen or $10.00 a hundred. For a short period during 1956, Parker published a weekly newspaper known as "Valley Center Crusader." The newspaper had a subscription rate, accepted advertising, and had a circulation of approximately 1,200. In 1956, Parker also published a newspaper entitled "National Christian Crusader, Santa Ysabel, California." Parker described this newspaper as the official news publication *269 of FDM. A large portion of each issue was devoted to advertising treatises, books, courses, and to a contest entitled "Gospel Treasure Hunt." All of these materials were available by filling out an application form and sending a stated amount of money to various organizations used by Parker at a Santa Ysabel post office box address. The Gospel Treasure Hunt was a fundraising campaign conducted from May 1956 to the early part of 1957. The rules of the contest required a "donation" of $2 payable in cash, check or money order. The rules also provided for multiple entries but required that each entry be accompanied by a "donation" of $2. The rules required that entries be on official entry blanks which were sold for $0.25 for four entry blanks or $0.75 a dozen. The contest was open to both members and nonmembers and, in addition to advertising the contest in the National Christian Crusader, separate announcements were mailed to contestants. One of these announcements contained the following application blank: ACCEPTANCE CERTIFICATE TO: National Contest Manager, GOSPEL TREASURE HUNT, P.O. Box 7, Santa Ysabel, California. YES, SIR! I certainly will accept the appointment as CONTEST MANAGER *270 of my local Chapter of the GRAND NATIONAL GOSPEL TREASURE HUNT! Rush my contest material, including 50 Official Entry Blanks, official rules, and all of the instructions I need to qualify for the big CASH AWARDS. I am enclosing my REFUNDABLE DEPOSIT of $2.00, with the understanding that it will be promptly refunded when 5 or more of my friends and neighbors mail their Entries to the GRAND NATIONAL GOSPEL TREASURE HUNT. During 1957, under the letterhead "SUCCESS UNLIMITED" and "From The Office of Dr. Merle E. Parker" circulars were mailed anouncing a publication entitled "TEN THOUSAND DOLLAR PLAN." The announcements described how to obtain the plan as follows: You cannot "BUY" my "TEN THOUSAND DOLLAR PLAN"… because IT IS NOT FOR SALE! I will send my "TEN THOUSAND DOLLAR PLAN" to every loyal Christian-American who sends a reasonably generous donation within the next couple of weeks, together with his promise to donate ONE-TENTH of the income he makes with the "PLAN" to carry on our World-Wide Work, including our EXPERIMENTAL FARM, and the Academy of Self Attainment. I want just TWO THOUSAND "hand-picked" men and women who are really LOYAL CHRISTIAN-AMERICANS! I do NOT want those who *271 are "curious", I do NOT want those who want to make some "special proposition". There is ONE WAY… AND ONLY ONE WAY… that you can get my "TEN THOUSAND DOLLAR PLAN": … Fill out and mail the enclosed DONATION FORM, and a reasonably generous donation ($10.00 or more.) to me, personally, BEFORE November 15th. I will then PERSONALLY see that your copy of the "PLAN" goes out to you… BY FIRST CLASS MAIL… CAREFULLY AND FULLY SEALED! You MUST SIGN the Donation Form. Please don't forget to do that, because if you do, there will be a delay until I can return it to you to be signed, and then you send it back again. Do it RIGHT NOW * * * PLEASE. PERSONAL. CHECKS must be "cleared" by our bank, and will cause a delay in mailing your "PLAN". Wrap currency in a piece of paper. It will arrive safely. Make Money Orders payable to: Dr. Merle E. Parker. To obtain the "TEN THOUSAND DOLLAR PLAN" an applicant was required to fill in a "DONATION FORM" addressed to Parker, which stated, in part: Yes, Dr. Parker, I promise to donate ONE-TENTH of the income I make with your TEN THOUSAND DOLLAR PLAN to help you with the Christian Work you are doing, including your EXPERIMENTAL FARM, and the Academy of Self Attainment. *272 I AM ENCLOSING A DONATION OF …. (@NOTE The PLAN will be sent to all who donate $10.00 or more * * *) The "TEN THOUSAND DOLLAR PLAN was later replaced by another publication written by Parker entitled "The $25,000 Pyramid Plan." In 1953, Parker distributed a ten-lesson plan entitled "Secrets of Wealth, Power and Success." In his announcement be stated: "I'M BETTING THE FULL PRICE OF THIS COURSE [$23.30] THAT IT WILL MAKE $1,000 FOR YOU WITHIN SIX MONTHS! IF IT DOESN'T, YOU OWE ME NOTHING! FAIR ENOUGH?" [3]
In 1954, the National Institute of Christian Healing offered its members "stock certificates" the proceeds from which were to be used to construct certain buildings. The State of California issued a cease and desist order which, together with the lack of response to the solicitation, caused the offering to be withdrawn. At the end of 1952 and in the middle of 1953, Parker advertised for employees in a local newspaper. These "Help Wanted" advertisements read in part as follows: [December *273 19, 1952] WANTED TO LEASE - an ALERT and ACTIVE MIND - * * *
My business is in the field of Direct Mail Advertising and Promotion. My customer list covers the Nation… and Canada. It was five times as big in 1951 as it was in 1950… and it was TEN TIMES as big in 1952 as it was in 1951. It is still growing… FAST! In choosing the young woman to train as my Executive Assistant, I shall place primary emphasis upon the three qualities mentioned above: Courage, Determination, Vision. This is the kind of position that is offered "once in a lifetime." * * *
If you want a POSITION… not just a "job"… and have enough courage to ask for it, I promise you will at least get an interview. That alone can be of lifetime value to you. You will have the opportunity to get a first hand view of the same Success Methods for which several thousand men and women throughout America paid me a total of fifty thousand dollars during 1952. I'll be waiting. Dr. Merle E. Parker, (Ps. D) P.O. Box 584, Escondido, Calif.
[July 31, 1953] WANTED TO LEASE - Two More Alert and Active Minds - * * *
Eight months ago I inserted an ad similar to this in The Times-Advocate. The young woman who was chosen for the position which *274 was open at that time is now earning fifty per cent more than any young woman of her age in Escondido, and twice as much as the average. My organization has continued to grow rapidly since January of this year, and I now have openings for two more young women who are seeking a permanent position where they can practically "write their own tickets." All applicants will be carefully considered and those with highest qualifications will be given the opportunity to prove their ability. Applicants will begin in the mailing department of my organization, which is now second largest in the field in the United States. We are currently mailing almost a quarter million pieces of mail a month to all parts of the world. FDM's administration building in Valley Center, California, was built in 1954 at a cost of approximately $75,000. In the meeting hall of this building Parker conducted weekly Sunday school and services for about 40 to 50 children and adults from Valley Center from Easter Sunday 1955 to the middle of June 1958. Friday night skating parties and summer swimming parties were held for members' children and guests on the FDM property during this period. On or about April 24, 1953, the *275 solicitor for the Post Office Department filed a complaint against Parker and FDM alleging violation of 39 U.S.C. secs. 259 and 732 for falsely and fraudulently obtaining money through the mails for the courses entitled "The Sacred Laws Behind Miracles" and "Secrets of Wealth, Power and Success." After a hearing, the complaint was sustained as to the latter course, and a fraud order was issued by the Deputy Postmaster General. This order was ultimately sustained by the Court of Appeals for the District of Columbia. Parker v. Summerfield, 265 F. 2d 359 (1959), rehearing denied 265 F. 2d 960 (1959). A similar proceeding instituted against Parker in March 1952 concerning his "Handbook and Practice Guide, with the complete Introductory Lesson in Suggestive Passivity Induction techniques", was settled in April 1952 when Parker agreed to discontinue its printing, publication, and distribution through the mails. As a result of numerous inquiries and complaints, the activities of Parker and the other organizations operating out of Santa Ysabel and Valley Center, California, were discussed in the newsletter issued by the Better Business Bureaus of Los Angeles and San Diego, California. In *276 response to the articles appearing in these reports, Parker on S.P.I. Foundation letterhead stationery wrote the following letter dated March 13, 1953, to the Better Business Bureau of San Diego: Gentlemen: I have your rather amusing report about me which was sent to my secretary recently in response to her request for information. It is too bad that the man who wrote it (so I am told) is now beyond the reach of mortal communications, having drowned off the coast of California the other day. At any rate, the entire article in what you call the "Reporter" is garbled, and based on half-truths. In the first place, the course mentioned in the circular which was so thoroughly misquoted is not directly connected with the fraternal organization the writer chose to try to hold up to ridicule. In the second place I am a mail order publisher and in business to stay. Last year I spent a total of a little more than ten thousand dollars for postage to mail literature and lesson material to SATISFIED CUSTOMERS. The Santa Ysabel Post Office was boosted to third class from fourth class shortly after I began mailing from there in 1951, so evidently the P.O. Dept is satisfied that I am not out to try *277 to "cheat the public" as your reports seem to insinuate. At present the Santa Ysabel P.O. is eligible to be increased in rank to Second Class, probably effective July 1, 1953. While your various "blurbs" in no way affect my business, I think it would be well for you at least to get things straight, instead of setting yourselves up as literary and thought-critics. It is no surprise to me that people like the man who wrote the article would not be interested in the deeper studies of the human mind and its relationship to "miracles" as they are called when they occur at religious meetings or shrines of various sorts. Few "rank materialists" are interested in these deeper things. So send out all the reports you want to, but at least try to be honest… if you know how! Yours very truly, Dr. Merle E. Parker P.S. The P.O. "fraud order complaint" referred to had no connection with the course ridiculed by the writer of this article and was corrected at once when brought to my attention. I have mailed 300,000 circulars since then. P.S. #2. I also am organizer and promotor of the Santa Ysabel Ming Tree Society and the Psycho-Metaphysical Research Society (Escondido), as well as Master Publications *278 (Riverside.) All mailorder. In his 1952 Federal income tax return, Parker listed his occupation as "Author-Publisher," stated that his principal business activities were "Selling books and lecturecourses by mail," and "Selling General Merchandise, Retail" (in a store which he ran as a sole proprietor). His main items of expense were for printed materials, labor, postage and "Rental fees for mailing lists from other publishers." In May 1957, FDM obtained a $30,000 loan from the First National Bank of Vista, California. In connection with this loan Parker submitted to the bank a sworn statement that as of May 2, 1957, FDM had assets of $313,447.69, liabilities of $23,989.05, and a surplus of $289,458.64. A profit and loss statement on this document reflected a net profit of $51,096.78 from donations of $135,428.67 and expenses of $84,331.89 in the period ending December 31, 1957. [4] *279 Its real estate holdings were stated to be land with a value of $14,000 and buildings and improvements with a value of $129,000. Neither Parker nor FDM and its related organizations maintained any formal books of account reflecting the combined or separate income and expense of the organizations. The only record of income and expense made available to respondent's agents was an incomplete set of cancelled checks and bank deposit records. These bank records were used by respondent's agents in arriving at the following figures for the years in issue: Gross
Deductible
Year
Income
Expense
1954
$207,435.28
$ 62,064.89
1955
87,920.22
38,866.02
1956
115,260.95
80,014.52
1957
29,207.21
12,961.16
1958
34,694.23
9,832.39
1959
170,088.80
126,266.08 Duplications between bank accounts were eliminated and nontaxable items were excluded from gross receipts. Amounts which appeared to be for capital improvements or personal expenses were disallowed as expenses. The revenue agent who examined the bank records of FDM was able to identify and classify all withdrawals except the following amounts: Year
Amount
1954
$34,488.51
1955
2,210.10
1956
Negligible
1957
1,300.27
1958
5,197.21
1959
8,948.34
Respondent has conceded that depreciation was allowable as follows: Depreciation
Depreciation
Year
on Assets
on Building
1954
$ 462.96
None
1955
1,311.55
$1,250
1956
1,614.92
1,250
1957
1,629.67
1,250
1958
1,629.67
1,250
1959
1,536.37
1,250
In *280 connection with a criminal action instituted in August 1956 against Parker for contributing to the delinquency of a minor, FDM checks were drawn for legal services in the amounts of $1,200 in 1956, $2,350 in 1957, and $600 in 1958; bail bond fee of $200 in 1956; and trial expenses of $50 in 1957. Parker was found not guilty of this charge after a jury trial. FDM was not a party to this action. In November 1956, Parker instituted a civil slander suit against a medical doctor and the mother of the minor to whose delinquency he was alleged to have contributed in the above criminal action. In connection with this suit, FDM issued checks to a court reporter in 1957 in the amount of $48.20 and for legal fees in 1958 in the amount of $1,000. FDM was not a party in this suit. On July 2 and 10, 1957, FDM checks in the amounts of $1,000 and $500 * *281 were drawn in favor of Parker. Notations on the face of the checks stated that they were in repayment of a loan. In 1958, checks totaling $445.31 were issued for items which Parker identified as "Personal" in a written schedule submitted to one of respondent's agents. All of the above FDM checks were signed by Parker in his capacity as "SUPREME GRAND COUNSELOR & NATIONAL DIRECTOR." FDM did not file Federal corporate or information tax returns for the years 1954 through 1959. An attorney consulted by FDM did not specifically advise Parker as to whether FDM should file Federal tax returns. The following caveat is printed under Parker's signature on the exemption application (Form 1023) which he filed on behalf of FDM: IMPORTANT A mere claim or contention by an organization that it is exempt from income tax under section 101 of the Internal Revenue Code and the corresponding provisions of prior revenue acts will not relieve the organization from filing income tax returns and paying the tax. Unless the Commissioner has determined that an organization is exempt, it must prepare and file a complete income tax return for each taxable year of its existence. Accordingly, every organization that claims to be exempt should furnish the information and data specified herein, together with any other facts deemed material to the question with the least possible delay, in order that the Commissioner can determine whether *282 or not it is exempt. As soon as practicable after the information and data are received, the organization will be advised of the Commissioner's determination, and, if it is held to be exempt, no further income tax returns will be required. A ruling letter dated November 16, 1955, from the exempt organizations branch of the Internal Revenue Service to FDM, advised that exemption was being denied and that "you will be required to file Federal income tax returns." Since 1949, Parker's practice was to file his Federal income tax returns with the district director of internal revenue at Los Angeles, California. A search of the records at that office revealed no record of Parker having filed a tax return for 1956 or 1957. In April 1957, Parker mailed a signed but unverified statement styled "U.S. INDIVIDUAL TAX RETURN" with a 1956 withholding Form W-2 attached thereto, to the above office. By form letter dated June 14, 1957, they were returned to him together with a blank Form 1040, U.S. Individual Income Tax Return for 1956, with instructions to complete the Form 1040 and forward it with the supporting documents attached. Parker did not thereafter file a Form 1040 for 1956. FDM was not *283 organized and operated exclusively for exempt purposes under section 501(c)(3). The failure of FDM and Parker to file returns in the years 1954-1959 and 1956-1957, respectively, was not due to reasonable cause. Opinion The principal issue for decision is whether, during the years in question, FDM was exempt from taxation under section 501(c)(3) [5] as an organization organized and operated exclusively for religious purposes. Respondent's principal contention is that FDM was not exempt because it was organized and operated for a substantial nonexempt purpose, namely, the publication and distribution by sale to the public of Parker's writings. We agree with *284 respondent. After a careful consideration of the extensive record in this case, we have concluded that not only was FDM not organized and operated exclusively for exempt purposes but that it was predominantly a commercial enterprise. That FDM had a nonexempt purpose which was "substantial in nature," Better Business Bureau v. U.S., 326 U.S. 279, 283 (1945), is clear. [6] We have set out in detail the nature of FDM's activities so that a brief summary will suffice to point out wherein it has failed to satisfy the statutory requirement.
FDM was organized in 1949 by Parker and a number of other persons (who he insisted at trial remain anonymous). Its primary purpose was stated to be "to teach the application of certain spiritual, psychological, physical, and metaphysical principals to the problems of daily life." Its bylaws provided for officers and the establishment of various subsidiary groups. Parker has occupied the position of national director since 1949 and is permitted by the bylaws to retain it *285 until death or voluntary resignation. Except for approximately four meetings with the national secretary at her home in Roanoke, Virginia, Parker has completely controlled and dominated the activities of FDM. The national treasurer, FDM's only other officer, never attended even these meetings and at the time of trial Parker had "lost track" of her. None of the subsidiary groups contemplated by the bylaws was ever set up. The principal activity of Parker and FDM has been the publication and distribution of numerous booklets, reports, pamphlets, newspapers and other printed materials. Under the names of Parker or FDM (and various affiliated groups which Parker considered as acting on behalf of FDM), announcements were mailed to persons whose names were on mailing lists compiled by Parker or rented or purchased by FDM. These solicitations requested "donations" and provided "application forms" which were to be filled out and returned in order to receive the described materials. Those who returned the forms with "donations" were put on FDM's "membership" and mailing lists, and received further announcements. At its apex in 1955, FDM's "membership" reached 65,000. Except for weekly Sunday *286 school and services, and skating and swimming parties principally for members from the Valley Center area, the only FDM activity which was even arguably of a religious nature was the publication and distribution of some of its materials. Respondent does not question that some of the publications were of a religious nature and we are not here attempting to define what constitutes a religion. See Golden Rule Church Association, 41 T.C. 719 (1964); and U.S. v. Seeger, 380 U.S. 163 (1965) (33 U.S. Law Week 4247, March 9, 1965). Nor are we distinguishing between FDM's religious activities and those of other groups. Niemotko v. Maryland, 340 U.S. 268 (1951); Fowler v. Rhode Island, 345 U.S. 67 (1953); United States v. Ballard, 322 U.S. 78 (1944); and Saint Germain Foundation, 26 T.C. 648 (1956). We do not understand petitioner to contend that the mailing of "announcements" was a religious activity. Cf. Golden Rule Church Association, supra, at pp. 728-729 and cases there cited. To defend its receipt of funds, petitioner places much reliance on the "end destination" test enunciated by the Supreme Court in the landmark case of Trinidad v. Sagrada Orden 263 U.S. 578 (1924), citing *287 the portion of that opinion which stated (at p. 581): Whether the contention is well taken turns primarily on the meaning of the excepting clause, before quoted from the taxing act. Two matters apparent on the face of the clause go far towards settling its meaning. First, it recognizes that a corporation may be organized and operated exclusively for religious, charitable, scientific or educational purposes, and yet have a net income. Next, it says nothing about the source of the income, but makes the destination the ultimate test of exemption. Evidently the exemption is made in recognition of the benefit which the public derives from corporate activities of the class named, and is intended to aid them when not conducted for private gain. Such activities cannot be carried on without money; and it is common knowledge that they are largely carried on with income received from properties dedicated to their pursuit. This is particularly true of many charitable, scientific and educational corporations and is measurably true of some religious corporations. Making such properties productive to the end that the income may be thus used does not alter or enlarge the purposes for which the corporation *288 is created and conducted. * * * The flaw in petitioner's argument is that it ignores the remaining portion of the Sagrada opinion, especially the paragraph at p. 582 where the Court said: As respects the transactions in wine, chocolate and other articles, we think they do not amount to engaging in trade in any proper sense of the term. It is not claimed that there is any selling to the public or in competition with others. The articles are merely bought and supplied for use within the plaintiff's own organization and agencies, - some of them for strictly religious use and the others for uses which are purely incidental to the work which the plaintiff is carrying on. That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed. The record in this case clearly shows that there was selling to the public. The fact that amounts received were denominated by petitioners as "donations" cannot obscure the fact that they were actually payments for the materials offered. Minimum "donations" were required, as made clear in petitioners' statement that "We do not make any exceptions under any circumstances, and we do *289 NOT send any Courses 'C.O.D.'" Materials were offered to members of the general public and the fact that they became "members" and had their names added to FDM mailing lists, does not change their status from that of purchasers of FDM's materials. Petitioners have introduced no evidence to show that the vast majority of these "members" had anything more in common with each other than the purchase of materials, much of which, as will be discussed below, was of a clearly nonreligious nature. The organizations under whose names FDM and Parker mailed many items appear to be nothing more than separate fund-raising organs. Furthermore, announcements of publications were sent to thousands of persons whose names were on mailing lists purchased or rented. Little, if any, suggestion was contained in these announcements that the materials were intended to further the religious or educational purposes of FDM. Especially with regard to the money making "plans" and puzzle contents offered by petitioners, emphasis was placed upon the financial benefits which would accrue to the individual "donors." The record is devoid of any indication that such benefits were offered by petitioners in furtherance *290 of religious or educational ideals rather than for mutual economic benefit. Unlike the Sagrada case, financial gain was the end to which the activities were directed. Similarly, the various newspapers published by FDM and Parker appear to be little more than an advertising medium for FDM's fund-raising activities and an instrument for Parker's self glorification. The present case has much more in common with Puritan Church - The Church of America, a Memorandum Opinion of this Court [7] affirmed per curiam 209 F. 2d 306 (C.A.D.C., 1953), than, as petitioners state, that the name of the individual petitioners in each case is Parker. While the Puritan Church case involved more of an endeavor by its mentor, Harrison Parker, to further his personal feud with the Chicago Tribune and certain public officials, because of the extent of the domination by the individual founders as well as the nature of many of the organizations' activities and publications, the two cases afford a close analogy. In Scripture Press Foundation, 152 Ct. Cl. 463, 285 F. 2d 800 (1961), the Court of Claims found that a corporation which published and sold religious literature was not entitled to *291 exemption under section 501(c)(3). As the Court said at p. 804: We believe the Saint Germain case [26 T.C. 648 (1956)] suggests, at least inferentially, the test for decision in this case: was the sale of religious literature by the plaintiff in this case incidental to the plaintiff's religious purposes? Or were plaintiff's religious objectives incidental to the sale of religious literature? * * * Petitioners' publication and sales activities were neither incidental in amount nor were many of them incidental to the religious purposes upon which it bases its claim for exemption. Cf. Trinidad v. Sagrada Orden and Saint Germain Foundation, both supra. Petitioners' reliance on A. A. Allen Revivals, Inc., a recent Memorandum Opinion of this Court, [8] is misplaced. Both the quantity and nature of petitioner's operations in that case were different from those in the instant case. That the content of some of the doctrines involved in both cases are similar does not aid petitioners herein. Religious purposes for the activities were established in that case and have not been established here. Our conclusion as to the nature of petitioners' activities are confirmed by many *292 statements made by Parker. In his 1952 income tax return he characterized himself as "selling books and lecture courses by mail" through a sole proprietorship which he described as a "mail order publishing business." No mention was made in the return of any religious or educational purpose for this endeavor. In 1952 and 1953 in two "Help Wanted" advertisements, Parker states that "My business is in the field of Direct Mail Advertising and Promotion"; "My customer list covers the Nation"; "several thousand men and women throughout America paid me a total of fifty thousand dollars during 1952"; and refers to "my organization, which is now the second largest in the field in the United States." No mention is made of FDM, which although not incorporated until 1955, was operating since 1949. Nor did petitioners make any showing that the activities carried on by Parker under FDM's name before and after incorporation were any different. His statement in a letter to the San Diego Better Business Bureau in March 1953 that, "I am a mail order publisher and in business to stay. Last year I spent a total of a little more than ten thousand dollars for postage to mail literature and lesson material *293 to SATISFIED CUSTOMERS" reflects Parker's primary concern. The record in this case permits of no other conclusion than that FDM was engaged in a substantial nonexempt activity and is not entitled to the exemption which it claims. Better Business Bureau v. U.S., supra. Because FDM was not an exempt organization during the years in question, the amounts received by it during those years constitute gross income. Petitioners have not introduced any evidence to overcome the presumptive correctness of the amounts determined by respondent, or shown that any amount thereof were gifts. We sustain respondent's determinations, as modified by concessions as to allowable deductions. Because of our resolution of this issue, we need not consider respondent's alternative contention that FDM is subject to the unrelated business income tax imposed by section 511. Respondent duplicated many items of income in the notices of deficiency sent to FDM and Parker as a result of bank deposits in various names. Since we have found these items to have been income to FDM, respondent's determination that they were income to Parker is incorrect. There remains, however, the question of whether certain other items *294 constitute taxable income to Parker. The first item involves two FDM checks drawn by Parker in 1957 in the amounts of $1,000 and $5,000. Notations on the face of the checks state that they were in repayment of a loan. Parker contends that he loaned these amounts to FDM from sums he received from members of FDM as "love offerings. " This contention is unsupported by anything other than his own testimony. The notebook in which he claims to have kept a record of such gifts was not introduced at trial. Cf. A. A. Allen Revivals, Inc., supra. No promissory notes or memoranda of the "loans" were even mentioned at trial. In view of the high degree of control which Parker exercised over FDM's finances, and the extent to which funds were commingled in bank accounts under the names of Parker, FDM and its affiliated organizations, we cannot accept his uncorroborated testimony. His contention that respondent failed to show he had personally accumulated sufficient wealth to substantiate the disputed receipts of income (most of which related to the items duplicated to FDM and found taxable to it) is without merit. [9] There is no burden upon respondent to show such an accumulation. Because of Parker's *295 failure of proof, we sustain respondent's determination as to this item. The second item relates to FDM checks totalling $445.31 which were issued for items Parker identified as "personal" in a written schedule submitted to one of respondent's agents. The third concerns bank account withdrawals which respondent's agents were unable to identify and classify, in the amounts as follows: Year
Amounts
1954
$34,488.51
1955
2,210.10
1956
Negligible
1957
1,300.27
1958
5,197.21
1959
8,948.34 Respondent determined that these amounts constituted taxable income to Parker. As with the prior items, we reject Parker's sole contention *296 that respondent's agents did not show that he accumulated the wealth indicated by these items as Parker has introduced no evidence as to either set of checks. We sustain respondent's determination except as to the unidentified withdrawals in 1954. Parker's 1954 taxable year is not before us, so that we have no jurisdiction to determine a deficiency as to that year. The last items determined by respondent to constitute taxable income to Parker are a series of FDM checks issued in connection with litigation. In August 1956, a criminal action was instituted against Parker for contributing to the delinquency of a minor. In November 1956, Parker brought a civil slander suit against a medical doctor and the mother of the minor to whose delinquency he was alleged to have contributed. FDM was not a party in either action. Parker was acquitted in the criminal action after a jury trial. The FDM checks in question were issued to pay legal and incidental expenses in connection with the two actions. Parker contends that these amounts are not income to him because they represent expenses incurred by him in his capacity as Supreme grand counselor of FDM and that any damages which might have been *297 collected in the slander suit would accrue to the benefit of FDM. We disagree. Although at trial Parker alleged that the criminal action (as well as the Post Office fraud actions and the Internal Revenue Service's action herein) was an effort to discredit and destroy FDM, we conclude that the litigation expenses discharged personal obligations of Parker and constitute income to him. Frank J. Matula, Jr., 40 T.C. 914 (1963); and Irving Sachs, 32 T.C. 815 (1959), affd. 277 F. 2d 879 (C.A. 8, 1960). FDM was not a party to either action; at best, the benefits which it might have realized from these actions were incidental to the personal benefits to Parker. No allocation of the respective benefits has been made and we decline to speculate as to one. Cf. Aaron Michaels, 12 T.C. 17, 20 (1949). The fourth issue is whether or not FDM is liable for additions to tax imposed by sections 6651(a) and 6653(a) for failure to file returns and for underpayment of tax from 1954 through 1959. During these years FDM filed neither information nor corporate tax returns. Although an attorney whom Parker consulted may have indicated to Parker that FDM was an exempt organization, he never specifically *298 advised Parker not to file returns for FDM. In view of this, the caveat i the FDM exemption application which Parker filed, and the ruling letter denying exemption, which stated that FDM would have to file Federal income tax returns, we find no basis for holding that FDM's failure to file was due to reasonable cause. The fact that Parker considered FDM to be exempt does not constitute reasonable cause. Puritan Church-The Church of America, supra. Since FDM was not an exempt organization during the years in question, the understatements are apparent. We sustain respondent's determination on this issue. The final issue is whether or not Parker is liable for the additions to tax imposed by section 6651(a) for failure to file returns in 1956 and 1957. A search of the records in the Los Angeles district director's office, where Parker filed his Federal income tax returns since 1949, failed to disclose any record of returns having been filed by him for 1956 or 1957. In April 1957, Parker mailed a signed but unverified statement styled "U.S. INDIVIDUAL TAX RETURN," with a 1956 W-2 withholding form attached thereto, to the above office. This was returned to Parker with a blank Form 1040 with *299 instructions that he complete the official form and forward it with the supporting documents attached. Parker did not thereafter file a Form 1040 for 1956. Parker's explanation for not returning the Form 1040 for 1956 was that "To the best of my recollection I did not see it when it came in. It is entirely likely that one of the employees at the Foundation at the time was receiving and opening mail and for some reason it was not called to my attention * * *." This does not constitute reasonable cause to fail to file the proper forms required by section 6011(a), or to resubmit his "statement" with the form provided to him. Parker's only testimony with regard to a 1957 return was that he "believed" he had filed such a return although he had no income for that period. He produced no copy of a return at trial. The district director's office shows no record of one having been filed. Parker's explanations are insufficient to sustain his burden of showing reasonable cause for his failure to file 1956 or 1957 returns, and we sustain respondent's determination on this issue. Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. The following is a typical such form: ENROLLMENT APPLICATION AND DONATION FORM To: Aquarius School of The Masters, Santa Ysabel, California
YES, I WANT YOUR COMPLETE COURSE OF 14 LESSONS IN COSMIC-DYNAMICS and I am enclosing a DONATION for your 1959 Expansion Program. I understand that your course in COSMIC-DYNAMICS is reserved for those who donate $10.00 or more, and will be mailed in one large package containing ALL 14 LESSONS. I also understand it will require about 30 days to prepare my lessons after my donation is received. I am enclosing: ( ) $25.00; ( ) $15.00; ( ) $10.00, or MORE: $ ↩
3. "The $25,000 Pyramid Plan" dealt primarily with the financial success possible from raising withworms. Although the announcements for the "TEN THOUSAND DOLLAR PLAN" are in evidence, its contents are not.↩
4. We assume that this date should be December 31, 1956, since the statement does not appear to be of a pro forma nature. FDM filed no Federal income tax returns, so the record herein does not clarify this point.
*. By official Tax Court Order dated October 27, 1965 and signed by Judge Raum, this figure was substituted for the sum $5,000.
5. SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC. * * *
(c) List of Exempt Organizations. - The following organizations are referred to in subsection (a): * * *
(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, * * *↩
6. Although not contended for by FDM, its qualification as any exempt organization under any of the other types of activities enumerated in section 501(c)(3) would fall for the same reason.↩
7. Dated May 22, 1951.↩
8. T.C. Memo. 1963-281↩.
9. The record indicated that Parker was paid a salary of $1,200 by FDM in the years in issue. While his testimony is to the effect that his expenses (most of which were paid by FDM) were minimal, this testimony is incomplete, vague, and in several respects inconsistent. For example, he states at page 171 of the transcript that he had no transportation expenses because FDM's staff car was available for all business. Yet at page 182, in speaking of another issue he refers to conferences in Washington, D.C., with an attorney where he "usually stayed only a few days and then flew back."↩