**SCRIPTURE PRESS FOUNDATION**
v.
**UNITED STATES.**

No. 115-56.

United States Court of Claims.
Jan. 18, 1961.

Robert V. Smith, Washington, D.C., for plaintiff, R. P. Smith, J. W. Kiernan and Smith, Ristig & Smith, Washington, D.C., on the brief.

George Willi, Washington, D.C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant, James P. Garland and Lyle M. Turner, Washington, D.C., on the brief.

JONES, Chief Judge.

Plaintiff is the successor of a corporation known as Scripture Press, Inc., organized in 1932 as a profit corporation under Illinois law. In May 1945, the stock of Scripture Press, Inc., was donated by its stockholders to plaintiff, Scripture Press Foundation, and Scripture Press, Inc., was then liquidated into plaintiff.

Plaintiff was organized on May 5, 1945, as a nonprofit, nonstock corporation, pursuant to the "General Not for Profit Corporation Act" of the State of Illinois, S.H.A. ch. 32, § 163a et seq. Following application by the plaintiff, the Commissioner of Internal Revenue issued a ruling in 1946 declaring plaintiff to be exempt from Federal income tax under the provisions of § 101(6) of the Internal Revenue Code of 1939, as amended,[1] on the ground that the plaintiff was organized and operated exclusively for religious purposes.

On December 31, 1953, the Chief, Exempt Organizations Branch, Office of the Commissioner of Internal Revenue, issued a ruling that plaintiff beginning with the fiscal year ended January 31, 1953, and for subsequent years, was not exempt from Federal taxes. Thereafter, plaintiff timely filed on March 18, 1955, corporate tax returns for the taxable years ended January 31, 1953, and January 31, 1954, reporting net taxable income for those years of $18,827 and $18,544, respectively, as representing profits from store operations and paid taxes for those years of $5,648.10 and $5,563.20, respectively. Plaintiff reported its store operations as taxable on the ground that amounts realized on these operations might be, although the plaintiff does not so admit, considered unrelated business as defined in §§ 421[2] and 422[3] of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1950, more particularly defined as Supplement U Net Income.

Thereafter, plaintiff duly filed claims for refund for taxes so paid. As no action was taken by the Commissioner of Internal Revenue with regard to these claims, plaintiff filed suit in this court to recover these taxes. Subsequently, deficiency assessments were made by the Commissioner of Internal Revenue, assessing taxes for 1953 at $153,058.48 and for 1954 at $173,039.63. Plaintiff paid

---

1. Section 101(6) of the Internal Revenue Code of 1939, 53 Stat. 33, as amended by § 301(c) (1), Revenue Act of 1950, 64 Stat. 906, 953, and by § 314(b) (1), Revenue Act of 1951, 65 Stat. 452, 492, 26 U.S.C. § 101(6).

2. As added by § 301(a), Revenue Act of 1950, 64 Stat. 906, 948, and amended by § 201(d), Excess Profits Tax Act of 1950, 64 Stat. 1137, 1216, and §§ 121(e) and 339(a), Revenue Act of 1951, 65 Stat. 452, 26 U.S.C. § 421.

3. As added by § 301(a), Revenue Act of 1950, 64 Stat. 906, 948, 26 U.S.C. § 422.

the additional assessment of $147,410.38 for 1953, filed a timely claim for refund, supplementing the prior claim for the same year, which claim was denied by the Commissioner of Internal Revenue. Consequently, plaintiff amended its original petition to this court to include the payment of the additional assessment for the year 1953, requesting recovery of taxes for 1953, totaling $159,588.18, including interest paid, plus interest thereon. Plaintiff has elected to present its petition against the deficiency assessment for the 1954 fiscal year in the Tax Court of the United States.

All issues concerning the amount of taxes, if any, to which plaintiff might be entitled to have refunded have been reserved for future proceedings. The only issues now before the court are as follows: (1) Is plaintiff entitled to exemption from Federal income taxes under § 101(6) of the Internal Revenue Code of 1939 and § 501(c) (3)[4] of the Internal Revenue Code of 1954? (2) If the plaintiff is so exempt, is any part of its activities subject to unrelated business tax under § 421 of the Internal Revenue

Code of 1939 and under § 512[5] of the Internal Revenue Code of 1954?

The first issue which we must resolve is whether plaintiff is exempt under § 101(6)[6] of the 1939 Code and the equivalent provision in the 1954 Code, § 501(c)(3)[7]. The plaintiff contends with considerable force that the single and overwhelmingly dominant motif of its activities is the betterment of the Protestant Sunday Schools of America. In other words, plaintiff asserts that it is "operated exclusively" for a religious purpose under § 101(6). The defendant contends with equal vigor that plaintiff's purpose is the preparation and sale of religious literature, and that it is therefore not "operated exclusively" for religious and charitable purposes. The defendant asserts that the sale of religious literature is not an activity which qualifies for tax exemption.

Before we inquire into the tax significance of plaintiff's activities, we think it pertinent to discuss the background of plaintiff's founders. The dominant personalities behind plaintiff and its predecessor, Scripture Press, Inc., were Mr. and Mrs. Victor Cory. Until 1925, Mr.

4. 68A Stat. 163, 26 U.S.C. § 501(c) (3).

5. 68A Stat. 170, 26 U.S.C § 512.

6. Section 101(6) of the Internal Revenue Code of 1939, 53 Stat. 33, 26 U.S.C. § 101(6) (1952 ed.), as amended by § 301(c)(1), Revenue Act of 1950, 64 Stat. 906, 953 and by § 314(b) (1), Revenue Act of 1951, 65 Stat. 452, 492, reads as follows:

"Exemptions from Tax on Corporations.

"Except as provided in paragraph (12)(B) and in supplement U, the following organizations shall be exempt from taxation under this chapter—

\* \* \* \* \* \* \*

"(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence

legislation. For loss of exemption under certain circumstances, see sections 3813 and 3814; \* \* \*"

7. The successor to § 101(6) of the Internal Revenue Code of 1939 is § 501(c)(3) of the Internal Revenue Code of 1954, 68A Stat. 163, which reads as follows:

"(c) List of Exempt Organizations.—

\* \* \* \* \* \* \*

"(3) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office."

Cory had been an electrical engineer. In that year, he and Mrs. Cory agreed to act on their deep interest in religion. Mr. Cory went to work for a religious publishing company. Gradually, Mr. Cory became concerned with what he regarded as the poor quality of existing teaching materials for Bible instruction in Sunday schools. Therefore in 1932, Mr. Victor Cory, his wife, Bernice, and others, organized Scripture Press, Inc., devoted to the preparation and sale of religious literature. Scripture Press, Inc., was succeeded by the plaintiff. The plaintiff, like its predecessor, has enjoyed a steadily increasing rate of sales over the years. The plaintiff is not connected with any particular religious denomination or church.

There is unfortunately no case law on the point as to whether a religious publishing house, lacking denominational ties, merits tax exempt status. However, there are cases involving publishing houses which are instructive. Counsel for both sides cite us to Forest Press, Inc. v. Commissioner, 1954, 22 T.C. 265. Forest Press was organized to prepare and publish a widely accepted system for indexing library collections, the Dewey Decimal Classification System. Forest Press sought exemption under the provisions of § 101(6) of the Internal Revenue Code of 1939. The Commissioner of Internal Revenue asserted that Forest Press was engaged in a commercial publishing enterprise and was consequently neither organized nor operated exclusively for scientific, literary, or educational purposes within the meaning of § 101(6).

The Tax Court declared Forest Press exempt. The defendant urges that any comparison between Forest Press and the plaintiff can only serve to point up the nonexempt nature of plaintiff's activities. The defendant asserts that in Forest Press the publications were priced to recover manufacturing cost plus enough to sustain the small staff of seven to ten persons working for the corporation.

The defendant distinguishes Forest Press from the plaintiff by comparing the slight profits realized by the former with the very substantial profits realized by the latter. If the defendant seeks by this distinction to suggest that where an organization's profits are very large a conclusion that the organization is noncharitable must follow, we reject such a suggestion. If, however, defendant means only to suggest that it is at least some evidence indicative of a commercial character we are inclined to agree.

Another case that is helpful, and perhaps more directly in point, is Saint Germain Foundation v. Commissioner, 1956, 26 T.C. 648. In that case, the petitioner, the Saint Germain Foundation, sought to qualify as an organization exempt from Federal income tax under § 101(6) of the 1939 Code. The Saint Germain Foundation was organized for the purpose of propagating the teachings of the "I Am" Religious Activity. The similarity between Saint Germain and the instant case arises from the fact that some religious literature was sold in connection with Saint Germain's activities. The Government argued that the Saint German Foundation received income from the sale ef religious publications and charged fees at its annual conclaves. The Government contended in Saint Germain that these income-producing activities showed that the petitioner was not "operated exclusively" for religious purposes. The Tax Court did not subscribe to the Government's position in that situation and said on page 658:

> "The sale of religious literature and the conclaves held to propagate the precepts of the petitioner are activities closely associated with, *and incidental to*, the religious purposes of the petitioner. Such activities bear an intimate relationship to the proper functioning of the petitioner, and we do not believe that income received from these activities prevents the petitioner from being an organization organized and operated

'exclusively' for religious purposes within the meaning of section 101 (6). Squire v. Students Book Corp. [9 Cir.], 191 F.2d 1018; Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578 [44 S.Ct. 204, 68 L.Ed. 458]." [Emphasis supplied.]

■ We believe the Saint Germain case suggests, at least inferentially, the test for decision in this case: was the sale of religious literature by the plaintiff in this case *incidental* to the plaintiff's religious purposes? Or were plaintiff's religious objectives incidental to the sale of religious literature? Apparently the plaintiff is convinced, as we are, that decision in this case will hinge on the answer to this question. Thus, plaintiff asserts that its fundamental objective is to stimulate the growth of the Sunday schools in the United States. The plaintiff asserts that its work toward this end comprises several phases. One phase is the plaintiff's Editorial Division which has the responsibility for preparing and disseminating the Sunday School lesson material. Another phase is the Christian Relations Department which does door-to-door evangelism. The plaintiff describes in its brief the final phase of its work—the Instructional Department—as follows:

"The most important phase, however, towards effecting this objective is performed by the Instructional Department, * * * free instructional work is provided without promoting the sale of Plaintiff-produced material, but with the primary objective * * * 'to inspire, improve, instruct' for the purpose of making better and more informed Sunday School teachers and Church leaders."

We think that plaintiff's assertion that its instructional activities are more important to plaintiff than its selling activities is entirely sincere. The evidence in this case, as is amply borne out by the findings of the trial commissioner, shows that throughout its history Scripture Press has been led by people of devout and intense religious conviction. However, the intensity of the religious convictions of the plaintiff's members and officers cannot operate to exempt them from the tax law if the activities of the plaintiff cannot in themselves justify such an exemption. Piety is no defense to the assessments of the tax collector.

In our finding 49, the trial commissioner reflects the total costs incurred by the plaintiff for its instructional work at Sunday school meetings and conventions and other sessions. The plaintiff vigorously argues that its primary interest was to better the Sunday schools of America by improving both the quality of instruction and the materials used in those schools. The instructional aspect of this endeavor involved outlays of monies by the plaintiff. The betterment of the lesson material used resulted in income to the plaintiff as a result of the sale of these materials. We think it is fair in making a determination as to what was the most important aspect of plaintiff's work to compare how much plaintiff accumulated as a result of its sales of religious literature and how much it expended for instructional activities.

| | Expenditures [8] for Religious Educational Programs | Accumulated [9] Capital & Surplus |
|---|---|---|
| 1951 | $21,835.67 | $476,311.14 |
| 1952 | 29,434.83 | 585,016.10 |
| 1953 | 36,452.08 | 744,798.26 |
| 1954 | 41,454.42 | 982,580.70 |
| 1955 | 46,378.63 | 1,188,629.17 |
| 1956 | 48,041.44 | 1,468,892.42 |
| 1957 | 72,886.27 | 1,610,817.30 |

We think the enormity of the contrast between what plaintiff has accumulated

8. These amounts are set out in our finding 49. The gross income and total expenditures are set out in finding 48. This finding will show the very small role expenses for religious education occupied in the whole picture of the taxpayer's total expenses.

9. The accumulated capital and surplus figures for each year are obtained by totaling the annual accumulated earnings and capital fund amounts set out in Table III in the trial commissioner's findings. See our finding 51.

from sales each year and what it has expended for its educational programs reveals that the sale of religious literature is its primary activity and that its instructional phase is incidental thereto. It is true that plaintiff erected a new building in Wheaton, Illinois, at a total cost in excess of $1,000,000 in 1956. Even allowing for the cost of the building, however, the disparity between amounts actually expended for instruction when compared with amounts realized in earnings is unaccountably small.[10]

The test we have developed from the Saint Germain case was first suggested by the Supreme Court in Trinidad v. Sagrada Orden, 1924, 263 U.S. 578, 44 S.Ct. 204. In Trinidad, the Court was concerned with construing paragraph G(a) and M of § II of the Act of October 3, 1913, 38 Stat. 172, 180, a predecessor of § 101(6) of the Internal Revenue Code of 1939. The defendant contended that the plaintiff, a Philippine corporation, was not "operated exclusively" for religious purposes because it used its properties to produce income, and traded in wine, chocolate, and other articles. The Court's characterization of this argument has significance here; the Court said 263 U.S. at page 581, 44 S.Ct. at page 205:

> "In effect, the contention puts aside as immaterial the fact that the income from the properties is devoted exclusively to religious, charitable and educational purposes, and also the fact that the *limited trading*, if it can be called such, is purely incidental to the pursuit of those purposes, and is in no sense a distinct or external venture." [Emphasis supplied.]

10. On this point—the significance of the large amounts aggregated by the plaintiff—the remarks of the United States Court of Appeals for the Ninth Circuit in Randall Foundation v. Riddell, 1957, 244 F. 2d 803, at page 807 a case not directly in point on the facts but nonetheless involving a construction of § 101(6), are certainly apposite:

In the language quoted above in Trinidad, the Supreme Court emphasizes that the taxpayer's activities were "limited" and "purely incidental" to the pursuit of its religious activities. We think the Trinidad case reflects the view that in these cases what is dispositive is whether the business activities of the taxpayer are incidental to its charitable objectives or whether, in fact, the converse is true.

We note that the Court said again at page 582, 44 S.Ct. at page 206:

> "As respects the transactions in wine, chocolate and other articles, we think they do not amount to engaging in trade in any proper sense of the term. It is not claimed that there is any selling to the public or in competition with others. The articles are merely bought and supplied for use within the plaintiff's own organization and agencies,— some of them for strictly religious use and the others for uses which are purely incidental to the work which the plaintiff is carrying on. *That the transactions yield some profit is in the circumstances a negligible factor. Financial gain is not the end to which they are directed.*" [Emphasis supplied.]

Can it be said of plaintiff's competitively-priced lesson material that financial gain was not the end to which its sale was directed? Can the impressive earnings which sale of the lesson materials has brought the plaintiff be said to be incidental to plaintiff's primary work? We think the answer to both these questions is in the negative. Weighing the cases discussed, and analyzing them for the implications they contain for solution of the case at bar, we conclude that the

"It is not our intention to say that a case can never be made out on the facts of a particular situation for aggregation of funds by a corporation for ultimate disposition to a charitable purpose. But a corporation which in its inception engages in trade, business * * *, and only has a vague charitable design, does not in our opinion come within the terms of the statute."

sale of religious literature was the primary concern of plaintiff's activities. We further conclude that the sale of these materials, however religiously inspired, involved the plaintiff directly in the conduct of a trade or business for profit.[11]

Plaintiff has not argued that if it does not qualify for exemption solely as a religious foundation, it qualifies for exemption as an educational foundation. However, we believe that a theory that plaintiff is exempt as an "educational" organization within the meaning of § 101 (6) is subject to the same defects inherent in the position that plaintiff's dominant purpose was religious in character. We think the plaintiff could not make a showing that its *primary* purpose was educational any more than it was able to make a showing that its *primary* purpose was religious. In Better Business Bureau v. United States, 1945, 326 U.S. 279, 283, 66 S.Ct. 112, 90 L.Ed. 67, the Court was presented with the question as to whether the Better Business Bureau of Washington, D. C., Inc., was exempt from social security taxes as a corporation organized exclusively for scientific or educational purposes within the meaning of § 811(b) (8) of the Social Security Act, 49 Stat. 620, 639, 42 U.S.C.A. § 1011(b) (8). Section 811(b) (8) of the Social Security Act repeats almost *in haec verba* the language of § 101(6) of the Internal Revenue Code of 1939. The Court there held that the petitioner was not exempt from Social Security taxes. The Court said at page 283 of 326 U.S., 66 S.Ct. at page 114:

"In this instance, in order to fall within the claimed exemption, an organization must be devoted to educational purposes exclusively. *This plainly means that the presence of a single noneducational purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly educational purposes.* It thus becomes unnecessary to determine the correctness of the educational characterization of petitioner's operations, it being apparent beyond dispute that an important if not the primary pursuit of petitioner's organization is to promote not only an ethical but also a profitable business community." [Emphasis supplied.]

We think the sales activities of plaintiff reflect "a non-educational purpose" and are not only "substantial in nature" but preponderate.

There is yet another facet to this case. The defendant argues that if the plaintiff should dissolve, it is possible for its earnings to be distributed to private persons, or for use for noncharitable ends. This of course is meant to suggest the possibility of inurement to private persons of the net earnings of the plaintiff, which is specifically prohibited by § 101(6). The defendant relies on the case of Scripture Press Foundation v. Annunzio, 1953, 414 Ill. 339, 111 N.E.2d 519, 521, wherein the Supreme Court of Illinois held that plaintiff was not exempt as a charitable foundation under § 2(f) (6) (g) of the Illinois Unemployment Compensation Act, Ill.Rev.Stat.1949, ch. 48, par. 218. Central to the Illinois court's determination that plaintiff was not a charitable foundation was the fact that there was nothing to prevent the foundation, upon dissolution, from disposing of the assets in any manner it chose. Plaintiff responds that this charge no longer carries with it any merit because it has since amended its charter by adding to its articles of incorporation a provision that on dissolution its assets shall go to such "religious, charitable, scientific, literary, or educational organizations, no part of the net earnings of which inures to the benefit of any private shareholder or individual * * * as the Board of Directors in their absolute discretion, may determine * * *."

11. At this point it should be remembered that there are many commercial concerns which sell Bibles, scrolls, and other religious and semi-religious literature which have not been granted exemption as to that part of their businesses.

Defendant's rejoinder to plaintiff's argument that on dissolution the Foundation will distribute its assets to charities is that the situation respecting amendment in plaintiff's bylaws is precisely as it was at the time when those bylaws were under consideration by the Supreme Court of Illinois. Plaintiff's articles of incorporation contain nothing, defendant urges, preventing further amendment to eliminate the provision respecting dissolution added May 20, 1954.

The possibility of inurement is of course raised by the opportunity for further amendment in plaintiff's bylaws. We very much doubt whether at least the present officers and members of the plaintiff would so move to amend. Therefore, we have not regarded this aspect of the case as in any way determinative.

■ A final matter remains to be considered. The plaintiff contends that the Commissioner of Internal Revenue was without authority to revoke the plaintiff's exempt status previously granted in 1946. Apparently plaintiff's theory is that once the Commissioner of Internal Revenue has issued a ruling he is forever precluded from revoking it. Plaintiff has adduced no authority to support this contention. We know of no limitation on the Commissioner of Internal Revenue precluding him from revoking plaintiff's exempt status in 1953 because he found then, as we find now, that plaintiff did not come within the meaning of § 101 (6). See Automobile Club v. Commissioner, 1957, 353 U.S. 180, 77 S.Ct. 707, 1 L.Ed.2d 746. Consequently, we think there is no merit in plaintiff's position on this point.

Since we find that Scripture Press Foundation's activities do not warrant tax exemption, we do not reach the issue as to whether any single part of those activities are subjected to Unrelated Business Tax under the provisions of § 421 of the Internal Revenue Code of 1939, as amended, and under the provisions of § 512 of the Internal Revenue Code of 1954.

In summary, we are compelled to reach a conclusion that plaintiff's activities are of a nonexempt character. We find that the crucial factor, in the light of the evidence, is that the sales aspect of plaintiff's work looms so large as to overshadow all else.

Therefore, plaintiff's petition will be dismissed.

It is so ordered.

WHITAKER, MADDEN, LARAMORE and DURFEE, Judges, concur.