UNITED MISSIONARY AVIATION, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
United Missionary Aviation, Inc. v. Commissioner
Docket No. 21512-80X
United States Tax Court
T.C. Memo 1990-566; 1990 Tax Ct. Memo LEXIS 638; 60 T.C.M. (CCH) 1152; T.C.M. (RIA) 90566; October 29, 1990, Filed *638 An appropriate decision will be entered. R. Travis Douglas, for the petitioner. Albert Sandlin and Stacey Eisenberg, for the respondent. KORNER, Judge. KORNER
MEMORANDUM OPINION In 1980, after a lengthy audit and appeal process, respondent retroactively revoked petitioner's tax-exempt status for years beginning after December 31, 1973. Having exhausted its administrative remedies, petitioner came before this Court pursuant to section 7428 [1] seeking a declaratory judgment as to the correctness of respondent's action. We originally dismissed this case following petitioner's failure to file a brief as ordered by this Court at the conclusion of the trial herein. Following remand by the Court of Appeals for the Eighth Circuit, 890 F.2d 418 (8th Cir. 1989), *640 reversing and remanding without published opinion an order of this Court, we must decide (1) whether respondent properly revoked petitioner's exempt status, and (2) if proper, whether respondent erred in giving this revocation retroactive effect. FINDINGS OF FACT [2]
*641 United Missionary Aviation, Inc. (hereinafter petitioner or UMA), was incorporated in 1968 pursuant to the provisions of the Texas Non-Profit Corporation Act. That same year, respondent recognized petitioner as an organization described in section 501(c)(3), exempt from Federal income taxes under section 501(a). At the time of filing its petition herein, UMA had its principal place of business in Fayetteville, Arkansas. Petitioner's principal incorporator was Jay D. Cole (Cole). Throughout its history, Cole has held the position of president and director of UMA. Cole is an ordained Southern Baptist minister who has worked in a variety of occupations. Cole received an aircraft pilot's license in approximately 1957 and in 1960 began a full-time aviation business. Beginning in 1965, Cole and his wife became acquainted with a missionary in the Bahama Islands. Cole began assisting this missionary by providing aviation services and other forms of assistance. Cole sold his aviation business in 1967 and on January 23, 1968, petitioner was formed. UMA apparently was funded with Cole's equity in a single airplane. At that time, UMA's principal place of business was in Garland, *642 Texas. UMA's articles of incorporation state that its corporate purpose is to: (a) Supply air transportation for missionaries and christian workers in furthering the spread of the Gospel of Jesus Christ. (b) Evangelize lost sinners using any and all legitimate means in order to make known the gospel and win souls to Christ. (c) Establish and edify local churches according to the New testament pattern. (d) [To] accomplish this two fold purpose, we will engage in all forms of missionary service including the sending, maintenance and support of missionaries at home and in foreign countries; sending gospel teams to conduct evangelistic, literature and visitation crusades; writing, printing and distribution of christian literature; Bible conferences, specialized forms of missionary work such as aviation evangelism, medical centers, photography, radio and television; the building of missions, chapels and churches; and other forms of missionary service as the Lord may lead.
Petitioner applied for exempt status in April 1968. In the application, petitioner gave a brief statement of the specific purposes for which it was formed: This organization *643 [was] established to conduct Christian activities in the interest of introducing Jesus Christ to as many individuals as may be possible prior to His return to take His people out of this present world. This is to be done by assisting missionaries and Christian workers by providing air transportation where needed, speaking in churches and other organizations where opportunity is given to present the story of Christ, and to transport individuals to and from various mission fields where they may witness true Christianity in action. The application also provided that UMA would not conduct any fund raising drives or business engagements, and that its only activities would be those specified, as noted above. Additionally, the application stated that any "Funds received will be used to purchase needed items for various missionaries as need arise, and to pay expenses and maintenance on aircraft used in the mission enterprise." By letter dated September 30, 1968, respondent granted petitioner tax-exempt status based upon the information supplied by petitioner as to its purpose and operations. [3]
*644 During 1968 and 1969, petitioner's primary activity was providing air transportation to various mission fields. UMA would organize groups of people to go to these fields to spend a week to ten days of interim training with a missionary. The air transportation supplied by UMA enabled these groups to fly directly to and from the mission fields where commercial transportation was often unavailable. To fund these trips, petitioner would charge the passengers for the cost of gasoline and oil. Petitioner, through Cole, stated that it tried to average at least one of these trips every two months. For 1969, petitioner filed a Form 990-A, Return of Organization Exempt From Income Tax, and reported the following receipts and disbursements: Gross Receipts
(derived from aircraft sales and rental)
$ 16,780 Less: Cost of Goods Sold For All Business
Activities (cost of aircraft)
(14,000)
Gross Profit
$ 2,780 Petitioner also reported expenses of earning gross income of $ 3,927.68, while receiving $ 1,409.81 in the form of contributions, gifts, grants, and similar amounts. In total, petitioner increased its net worth by $ 343.13 for the year. *645 The gross receipts for 1969 reflect that at some point during the year petitioner sold its aircraft. Since selling its aircraft, petitioner to date has not provided any further air transportation. On January 5, 1971, respondent reaffirmed petitioner's tax exempt status for taxable years 1968 and 1969. This action was based in part on information supplied by petitioner concerning its status. When asked to identify what type of organization it was, UMA provided respondent a copy of its articles of incorporation and a letter dated August 4, 1970, written by Cole as director of UMA. In it Cole stated that UMA was "presently involved in a teaching and lecturing effort in various schools and churches in an effort to interest Christian folks in entering the mission field, along with the activities listed in [petitioner's] articles of incorporation." For taxable years 1970, 1971, and 1972, petitioner had gross receipts under $ 5,000 and filed no returns. [4] For taxable years 1974 and 1975, however, UMA's receipts and disbursements increased substantially. The increase in petitioner's financial activity in 1974 and 1975 can be attributed to what petitioner designated as its Missionary *646 Tape and Equipment Supply (MTES) division. Although MTES apparently was begun earlier, [5] respondent was first notified in writing of the existence of MTES when petitioner filed its 1974 Form 990. In the early stages of MTES, petitioner assisted various churches and other religious organizations by providing them prerecorded religious cassette tapes and equipment to play them on. MTES itself produced the recorded tapes by obtaining a master tape from a religious speaker and then duplicating the tape for its own library. These tapes *647 were then either sold or loaned to others so they could make their own copies. MTES also provided audio and visual equipment, and assisted in the selection and installation of this equipment. During the early 1970's, there apparently was a dramatic increase in the use of cassette tapes to spread religious doctrine to shut-ins and other formerly inaccessible groups. Consequently, the demand for petitioner's goods and services increased resulting in a rapid expansion of its operations. To facilitate its operations, petitioner spent $ 25,000 remodeling a barn on Cole's property. This barn housed petitioner's offices, tape library, and inventory. It also displayed merchandise that people visiting the facility could purchase. At its largest, in excess of $ 300,000 worth of tapes and equipment were stored on petitioner's premises. Petitioner had both volunteer and paid employees. During 1973 and 1974, approximately 12 persons were paid employees in petitioner's MTES division. Cole, however, received no salary in any year. [6]
*648 To promote its equipment, petitioner had catalogs published that were distributed to persons and organizations named on a mailing list provided by the publisher. Approximately 80,000 copies of "Catalog No. 3" were published and distributed in about 1974 at a cost of $ 24,225. In July and August of 1975, approximately 121,000 copies of "Catalog No. 4" were published and distributed. Petitioner's catalogs were primarily secular, although they did contain some religious references. Catalog No. 3 was comprised of 89 pages. Quotes from the Bible appeared in several places throughout the catalog. Pages 5 through 16 contained advertisements for religious tapes. The remainder of the catalog was devoted to commercial items including blank tapes, cassette players, amplifiers, calculators, home entertainment systems, am/fm clock radios, and citizen band radios. The manufacturers whose products are listed in the catalog include well known names such as Craig, Kodak, Sony, Sanyo, Hitachi, and Panasonic. The catalog also contained the statement: "If you have already received a copy of this catalog, please pass this copy on to someone else." Catalog No. 4 contained all the information, *649 other than price differences, previously described in Catalog No. 3. In addition, it also listed petitioner's own brand of cassette tapes as well as commercial catch phrases including the statement: "Missionary Tape & Equipment Supply is the largest distributor of bulk cassette tapes in the world." According to both catalogs, the prices listed were wholesale prices to Christian workers and above-wholesale prices to others. The tape prices were listed at $ 1.75 per tape plus 5 percent Texas sales tax. Those purchasing equipment were asked to include 10 percent or $ 6.00 for postage, whichever was less, the balance to be billed if greater. Petitioner purchased its inventory directly from various suppliers. Petitioner had contact with a manufacturer's representative for its territory, who provided a printed price list. The merchandise was then financed by granting petitioner credit. No sales invoices were kept by petitioner that would specify what percentage of sales were attributable to recorded tapes versus what percentage of sales was attributable to blank tapes and equipment. Under petitioner's pricing structure, there was a 20-percent markup above wholesale which resulted *650 in an average net profit of 7.9 to 8.2 percent, after all expenses were paid. In 1974, UMA's Form 990 contained the following information: Gross Sales and Receipts From All Sources
$ 1,054,492.73 Less: Cost of Goods Sold
(732,850.93)
Plus: Contributions, Gifts, Grants,
etc. Received
2,000.00 Gross Receipts
323,641.80 Less: Expenses Attributed To Gross Income
(150,203.71)
Increase in Net Worth
$ 173,438.09 Included in the expenses attributable to gross income was an expense of $ 50,721 for employee salaries and wages and $ 3,823 for contributions, gifts, grants, and similar amounts paid out. In 1975, petitioner's Form 990 reported the following: Gross Sales and Receipts From All Sources
$ 906,211 Less: Costs of Goods Sold
(707,076)
Plus: Contributions, Gifts, Grants
etc. Received
1,059 Gross Receipts
200,194 Less: Expenses Attributable to Gross Income
102,612 Increase in Net Worth
$ 97,582 Included in the expenses attributable to gross income was an expense of $ 46,773 for employee salaries and wages and $ 8,607 for contributions, gifts, grants, and similar amounts paid *651 out. Not included in the contributions and like amounts paid out are approximately six instances that petitioner can document where it gave away free merchandise totaling something less than $ 10,000. Overall, from the beginning of 1974 to the end of 1975, petitioner's net worth increased from about $ 50,939 to $ 321,958. In September of 1975, an agreement was executed whereby petitioner sold its MTES division to an unrelated organization for the wholesale book cost of the merchandise and the cost of the office equipment. That organization now runs the operation for a profit, although the sales agreement provided that the purchaser was to continue operating the tape and equipment supply as a nonprofit organization. [7] The sales agreement contained a covenant not to compete as to petitioner and Cole, individually, which precluded the latter parties from dealing in blank tapes and equipment supplies for a period of five years in the continental United States. *652 In a separate agreement, Cole, individually, sold his land, house, and barn for approximately $ 160,000 to the same organization that purchased MTES. No part of the purchase price was allocated to the barn nor did Cole turn over any of the money to petitioner despite the $ 25,000 improvements made by UMA to Cole's property. After selling his house, Cole moved to Fayetteville, Arkansas and petitioner moved with him. OPINION Respondent determined that in operating a mail order sales business as its primary activity for years beginning after December 31, 1973, petitioner was not operated exclusively for exempt purposes as required by section 501(c)(3), so as to be exempt under section 501(a). Petitioner has the burden of proof in overcoming the grounds set forth in respondent's revocation letter. Freedom Church of Revelation v. United States, 588 F. Supp. 693, 696 (D.D.C. 1984); Rule 217(c)(2)(A). Section 501(c)(3) provides, in part, that an organization which is organized and operated exclusively for exempt purposes, in which no part of the net earnings inure to the benefit of any private shareholder or individual, qualifies as a tax exempt organization. *653 To be organized and operated for an exempt purpose, the organization must satisfy both the organizational and operational tests prescribed in section 1.501(c)(3)-1(b) and (c), Income Tax Regs.Levy Family Tribe Foundation v. Commissioner, 69 T.C. 615, 618 (1978). Respondent does not question petitioner's ability to pass the organizational test. Rather, respondent asserts petitioner failed to satisfy the operational test for years beginning after December 31, 1973. Section 1.501(c)(3)-1(c)(1), Income Tax Regs., provides: (c) Operational test -- (1) Primary activities. An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of such exempt purposes specified in section 501(c)(3). An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose.
In determining whether the operational test is met, our focus is on the purpose toward which an activity is directed, rather than the nature of the activity itself. B.S.W. Group, Inc. v. Commissioner, 70 T.C. 352, 356-357 (1978). *654 Consequently, "Even if petitioner's activities would normally constitute a trade or business, petitioner will not be disqualified so long as its activities further an exempt purpose." Junaluska Assembly Housing, Inc. v. Commissioner, 86 T.C. 1114, 1121 (1986) (citing B.S.W. Group, Inc. v. Commissioner, supra at 357). Although the exclusivity requirement of section 501(c)(3) does not mean "solely" or "absolutely without exception," Church in Boston v. Commissioner, 71 T.C. 102, 107 (1978), as explained by the Supreme Court in Better Business Bureau v. United States, 326 U.S. 279, 283 (1945):
to fall within the claimed exemption, an organization must be devoted to [exempt] purposes exclusively. This plainly means that the presence of a single [nonexempt] purpose, if substantial in nature, will destroy the exemption regardless of the number or importance of truly exempt purposes. * * * Under this analysis, it is possible for an organization's activities to have multiple purposes, both exempt and nonexempt. B.S.W. Group, Inc. v. Commissioner, supra at 357.When an organization's *655 activities have a nonexempt purpose, and that purpose is "substantial in nature," the operational test will not be met. Manning Association v. Commissioner, 93 T.C. 596, 604 (1989). During the time in question, petitioner's primary activity was the operation of its tape and equipment supply division. Determining whether petitioner's MTES activity encompasses a substantial nonexempt purpose, irrespective of the existence of any exempt purposes, therefore, is our critical inquiry. Manning Association v. Commissioner, supra at 611. Making this determination is difficult at best. It is a question of fact to be determined by the facts and circumstances particular to each case. Manning Association v. Commissioner, supra at 603-604.To assist us in deciding this question, we note that the courts have generally focused on how an organization carries on its activities, implicitly reasoning that an end can be inferred from the chosen means. Church of Scientology of California v. Commissioner, 83 T.C. 381, 475 (1984), affd. 823 F.2d 1310 (9th Cir. 1987), cert. denied 486 U.S. 1015 (1988). *656 Although no one factor alone is determinative, based on the facts before us, we hold that petitioner possessed a nonexempt commercial purpose that was substantial in nature. We find the following factors to be of particular relevance in this case: 1. The manner in which an organization conducts its activities is relevant evidence of a forbidden purpose. B.S.W. Group, Inc. v. Commissioner, supra at 359.Petitioner's tape and equipment supply division was operated in the same manner as that of any profitable commercial enterprise. Electronic equipment was purchased on credit from manufacturers, which was then used to stock petitioner's inventory. Petitioner thereafter sold this equipment by mail order, or, less frequently, directly to people visiting the display maintained on petitioner's premises. Catalogs were used to promote the sales of petitioner's merchandise. Commercial catch phrases can be found throughout the catalogs, and proclaimed petitioner to be the largest distributor of bulk cassette tapes in the world. 2. Competition with commercial firms also is strong evidence of a substantial nonexempt purpose. B.S.W. Group, Inc. v. Commissioner, supra at 356-358. *657 The majority of equipment and blank tapes offered by petitioner were also offered by other commercial firms. Even the prerecorded tapes offered by petitioner could be obtained from other distributors. 3. Whether an organization provides its materials at or below cost is another consideration in determining whether an organization has a commercial purpose. Pulpit Resource v. Commissioner, 70 T.C. 594, 610-611 (1978).Petitioner priced its merchandise approximately 20 percent above cost. This netted petitioner a 7.9-8.2 percent profit margin after expenses. Petitioner argues that its low prices enabled numerous religious organizations to purchase tapes and equipment they otherwise could not afford. The record contains several letters from some of these organizations supporting this contention. However, the selling of merchandise at a discount is not, of itself, a charitable deed. [8]Federation Pharmacy Services, Inc. v. Commissioner, 72 T.C. 687, 692 (1979), affd. 625 F.2d 804 (8th Cir. 1980). *658 Petitioner also claims that its pricing formula was necessary because it gave away large amounts of tapes and equipment to various religious organizations. In these situations, petitioner claims it wrote up no-cost invoices so that the $ 3,823 for 1974 and the $ 8,607 for 1975 that petitioner's Form 990 shows as contributions, gifts, and like amounts does not reflect this free merchandise. Petitioner, however, can only document making approximately six donations for a total amount of less than $ 10,000, while it claims to have donated in excess of $ 200,000. It is axiomatic that persons claiming special tax treatment must maintain records to support their status. Sec. 6001; sec. 1.6001-1(c), Income Tax Regs. We refuse to acknowledge petitioner made contributions in excess of those which it can document. 4. Substantial profits, while not determinative, also indicate an organization's primary purpose is commercial in nature. Scripture Press Foundation v. United States, 152 Ct. Cl. 463, 470-471, 285 F.2d 800, 803-804 (1961), cert. denied 368 U.S. 985 (1962); B.S.W. Group, Inc. v. Commissioner, supra at 357.For 1974, petitioner *659 had net profits of approximately $ 173,438. Even accepting dubitante petitioner's argument that its accountant inadvertently failed to report a $ 74,000 liability, petitioner had net profits greater than $ 99,000. In 1975, petitioner had net profits of $ 97,582. At the end of 1969, petitioner had a net worth of about $ 343. During the 1974 to 1975 period, petitioner's net worth increased from $ 50,939 to $ 321,958. Petitioner argues that it had an exempt purpose in accumulating its profits. In Presbyterian & Reformed Publishing Co. v. Commissioner, 743 F.2d 148 (3d Cir. 1984), revg. 79 T.C. 1070 (1982), the Court of Appeals for the Third Circuit overturned our holding that an accumulation of capital for business expansion by a publisher of religious materials was commercial in nature. The Third Circuit stated: In light of the clear notice to the IRS of [petitioner's] need to expand its physical capacity, the claim that the accumulated profits would be used for this purpose, and the recognition by the IRS of such expansion as a legitimate reason for cash accumulation, we are unable to affirm the Tax Court's determination that [petitioner's] *660 cash-on-hand situation was a strong indication of a non-exempt purpose. [Presbyterian & Reformed Publishing Co. v. Commissioner, supra at 157-158.]
We find the reasoning in Presbyterian & Reformed Publishing Co. v. Commissioner, supra, to be inapplicable to the present case for three reasons. First, at no time did petitioner give respondent a notice of a need to accumulate profits. Second, the merchandise sold by petitioner was for the most part not inherently religious in nature. Third, and perhaps most important of all, petitioner has failed to meet its burden of proving that respondent erred in determining petitioner's accumulated profits were being used to further a nonexempt purpose. Petitioner, through Cole, testified that all of its proceeds were put right back into its tape and supply division and that "after everything was done" there was not any money left over until after MTES was sold in 1975. In a letter to respondent dated September 14, 1978, Cole stated that by July 1974 petitioner had incurred a debt of $ 205,000 purchasing merchandise for various religious organizations which it decreased through *661 the use of its profits to $ 50,000 by September 1975. As we noted above, we are not going to presume that petitioner donated for charitable purposes in excess of $ 200,000 worth of merchandise without any documentation to support it. We also note that petitioner's profits for 1974 and 1975 are determined after the cost of goods are taken into account. Petitioner also makes an argument apparently based on the case of Pulpit Resources v. Commissioner, supra, where we held that an organization that prepared and published sermons for use by various clergy was operated exclusively for an exempt purpose. The facts at bar are also distinguishable from those in Pulpit Resources. By failing to keep records as to what portion of sales were from recorded religious tapes compared to all other sales, petitioner fails to prove to what extent, if any, it was selling religious literature. Despite the testimony by Cole that he knew most of the people purchasing from petitioner, we find that clergy were not the only purchasers. Petitioner did not prepare its mailing list and did not know all of its customers. It also encouraged people to pass the catalog on to others *662 with no limitation as to who could purchase tapes and equipment. Based on the foregoing, we hold petitioner's activities with MTES show petitioner had a substantial commercial purpose. Petitioner's alternative argument, that it should be taxed on its unrelated business income rather than have its exempt status revoked, must also be denied. Requisite to having merely its unrelated business income taxed, petitioner must first prove that it is an exempt organization. Sec. 511(a); Orange County Agricultural Society v. Commissioner, 893 F.2d 529, 533 (2d Cir. 1990), affg. a Memorandum Opinion of this Court. This it has failed to do. By finding that petitioner was not operated exclusively for an exempt purpose, we need not address respondent's alternative argument that petitioner's net earnings improperly inured to the benefit of private shareholders or individuals. The final issue for our consideration is whether the revocation should be imposed retroactively. Section 7805(b) provides that the Secretary "may prescribe the extent, if any, to which any ruling or regulation, relating to the Internal Revenue laws, shall be applied without retroactive effect." Pursuant *663 to this authority, the Secretary has limited respondent's discretion to retroactively revoke his rulings respecting organizations once found to be exempt by section 601.201(n)(6)(i), Statement of Procedural Rules, which states: Revocation or modification of rulings or determination letters on exemption and foundation status. (i) An exemption ruling or determination letter may be revoked or modified by a ruling or determination letter addressed to the organization, or by a revenue ruling or other statement published in the Internal Revenue Bulletin. The revocation or modification may be retroactive if the organization omitted or misstated a material fact, operated in a manner materially different from that originally represented * * *. In any event, revocation or modification will ordinarily take effect no later than the time at which the organization received written notice that its exemption ruling or determination letter might be revoked or modified. [26 C.F.R. sec. 601.201(n)(6)(i) (1990); emphasis added.]
A retroactive revocation will not be disturbed in the absence of an abuse of discretion. Automobile Club v. Commissioner, 353 U.S. 180, 184 (1957). *664 On the facts before us, we cannot say respondent abused his discretion. We think petitioner operated in a manner materially different from that originally presented. On its application for exempt status, petitioner stated its purpose was to promote the Christian Gospel primarily by providing air transportation for missionaries and Christian workers. Respondent granted the exemption in 1968 based on this information and on the understanding that the continuing operation would conform. Petitioner disposed of its only airplane the next year. Although given numerous opportunities, petitioner did not inform respondent of its MTES division until filing its Form 990 for 1974. Petitioner contends that it was engaging in its MTES operations from its inception. Petitioner also argues that it orally let respondent's agent know of this fact and the agent told petitioner that the conduct of a mail-order activity would not jeopardize the exemption. Oral statements are not tax rulings and cannot be relied on as such. Bornstein v. United States, 170 Ct. Cl. 576, 582, 345 F.2d 558, 562 (1965).We conclude respondent did not err in revoking petitioner's tax-exempt status retroactively. *665 An appropriate decision will be entered. Footnotes
1. All statutory references are to the Internal Revenue Code, as in effect for the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. The record in this case consists of the administrative record, stipulated exhibits, and the record made at trial. Because this case involves the revocation of exempt status (where respondent undertakes his own fact finding), rather than the initial denial of tax-exempt status (where respondent accepts as true the statements of the organization, as contained in the administrative record), a trial concerning contested factual issues was warranted. See Rule 217(a) and the notes thereto.↩
3. An addendum to the letter granting exemption sent by respondent stated that since UMA's operations had been limited, the exemption was granted on the understanding that the continuing operations of UMA would continue to conform. The letter also stated that any changes in operation from those described, or in UMA's character or purposes, was to be reported immediately to respondent for consideration of their effect on petitioner's exempt status.↩
4. The record is not clear whether a return was filed or what petitioner's gross receipts were for tax year 1973.↩
5. The parties disagree as to when petitioner began its MTES operation. Petitioner alleges it was performing the functions of MTES from the time it was organized and had orally notified respondent of this. Respondent contends MTES was not begun until after petitioner sold its aircraft. In any event, the parties agree that by 1974 MTES was in full operation.↩
6. Although the record is not clear on this point, it does appear that Cole was receiving approximately $ 600 per month from petitioner as rent for the use of his barn. In any event, Cole's only income during this period of time was approximately $ 900 per month obtained from his rental properties.↩
7. The record does not explain whether petitioner attempted to enforce the agreement.↩
8. Indeed, a less charitable interpretation might be that petitioner was willing to take lower prices in order to undercut its competition.↩